## O'BOYLE v. CORNELL STEAMBOAT CO.

### THE MAY QUEEN.

(Circuit Court of Appeals, Second Circuit    March 3, 1924.)

#### No. 257.

1. Towage ⚯11(1)—Towing tug is relieved from responsibility by safe landing of tow.

When a tug master has brought his tow to her place of destination, and moored or landed her safely at that destination, his task is completed, and he is discharged from further responsibility.

2. Towage ⚯11(10)—Tug held liable for injury to tow caused by negligent mooring.

A tug which, during a high wind, left her tow, consisting of 25 to 30 boats and about 1,000 feet long, with only the first tier made fast to a pier, leaving the other boats to tail out into the stream, where they were subject to the full force of the wind and the changing tide, held liable for injuries caused by the pounding of the boats against each other.

Appeal from the District Court of the United States for the Eastern District of New York.

Suit in admiralty by Anthony O'Boyle, owner of the scow May Queen, against the Cornell Steamboat Company. Decree for libelant, and respondent appeals. Affirmed.

Appeal from a decree of the District Court for the Eastern District of New York awarding to libelant appellee damages in the sum of $8,668.75. The damage complained of by libelant had been sustained by its scow May Queen on the early morning of November 17, 1920, in the circumstances stated infra.

On November 16, 1920, at about 7 a. m., the deck scow May Queen, loaded with a deck cargo of crushed stone, was placed in a fleet tow of appellant at Tompkins Cove. The fleet was bound down the Hudson river to the "market" at 51 Fifty-Fourth street, North River. The tug Senator Rice had the tow in charge, and the tug Mead acted as helper. Both of these boats were owned and operated by appellant. The tow as finally made up consisted of from 25 to 30 boats, made up in 8 or 9 tiers, and was about 1,000 feet long. The May Queen was on the port side of the tow and in the third tier from the tail end.

As the fleet proceeded down the river the wind increased in force. The tugs with tow arrived at the "market" about 1 a. m. on November 17, 1920. The evidence as to the weather at that time varies, but the witnesses stated the velocity of the wind at from 30 to 50 miles. The tide was flodd at the time of arrival of the fleet at the "market." The tugs made the tow fast by running lines from the boats in the forward tier to a spile on Pier 54. No breast lines were carried out from any other boats, and no other lines of any kind were put out. As the tow was made fast in this manner, with the lines running to the boats in the forward tier, the tow tailed up the river upon the flood tide with the tail extending out into the river about 100 feet from the piers. The May Queen was about 50 feet from the end of the piers. The boats, lying close to the shore, received some protection from the full force of the strong northeast wind.

About 2:30 a. m. the tide changed to ebb and the tail of the tow swung out into the river, so that the boats were exposed to the full force of the ebb tide and the northeast wind. The water was quite rough out in the river, and, in consequence, the boats began to pound, and finally the May Queen capsized, by reason of the injuries she received, and other boats were dam-

⚯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

aged. Irrespective of the Weather Bureau signals and records, the evidence satisfies us that the storm was severe and a number of boats lying at the Cornell Stakeboat further out in the river were also injured.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Erskine and Alvah H. Combs, both of New York City, of counsel), for appellant.

Macklin, Brown & Van Wyck, of New York City (H. L. Cheyney, of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above). [1] This case really involves a question of fact, for the law is simple enough. When a tug master has brought his tow to her place of destination, and moored or landed her safely at that destination, his task is completed, and he is discharged from further responsibility. Hughes v. Railroad Co. (D. C.) 93 Fed. 510. McWilliams v. Railroad Co., 203 Fed. 859, 122 C. C. A. 84; The Jersey Central, 221 Fed. 625, 137 C. C. A. 349; The Ganoga, 257 Fed. 720, 169 C. C. A. 8.

[2] The question in the case at bar, therefore, is whether the tow was safely moored. There was at least a moderate gale from the northeast, with a rising wind. Any experienced master should have known that with a change of tide there would be an additional risk to have craft floating further out in the river. It was not proper to leave a tow 1,000 feet long to swing out into the river on the change of tide. The danger attendant upon such procedure is that, as soon as waves arise, the tow chafes, rubs, or pounds. The pounding is precisely what happened here and as a result the May Queen capsized. All of this should have been foreseen by the tug master in the exercise of reasonable care. Therefore we think it plain that the tug master was negligent in leaving the tow as he did in the then existing circumstances.

We see no merit in the contention that the barge master was guilty of contributory negligence because of any failure to make a proper effort to obtain assistance during the 2½ hours the tow was lying at the pier before the damage occurred. The barge master's boat was too far away from the pier to enable him to step ashore and to attempt to go ashore would have been a risky undertaking. The barge master and the other captains "hollered for Cornell" and asked that a Cornell boat be sent out. That was about all he and the other captains could do.

Decree affirmed, with costs.